IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION


PEGGY LEE HATFIELD                                                          PLAINTIFF


         v.                              CIVIL NO. 16-5148


NANCY A. BERRYHILL, [1] Acting Commissioner,
Social Security Administration                                              DEFENDANT

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff, Peggy Lee Hatfield, brings this action pursuant to 42 U.S.C. § 405(g), seeking

judicial review of a decision of the Commissioner of the Social Security Administration

(Commissioner) denying her claims for a period of disability and disability insurance benefits

(DIB) under the provision of Title II of the Social Security Act (Act). In this judicial review,

the Court must determine whether there is substantial evidence in the administrative record to

support the Commissioner's decision. See 42 U.S.C. § 405(g).

## I.      Procedural Background:

Plaintiff protectively filed her current application for DIB on February 27, 2014,

alleging an inability to work since December 23, 2013, due to the following conditions:

neurogenic syncope, acid reflux, asthma, allergies, and an anxiety related disorder. (Doc. 7, p.

76). An administrative video hearing was held on May 29, 2015, at which Plaintiff appeared

with counsel and testified.  (Doc. 7, pp. 29-69).

---

[1]  Nancy A. Berryhill, has been appointed to serve as acting Commissioner of Social Security, and is substituted as
Defendant, pursuant to Rule  25(d)(1) of the Federal Rules of Civil Procedure.

In a written opinion dated July 1, 2015, the ALJ found that the Plaintiff had a severe impairment of neurogenic syncope.[2] (Doc. 7, p. 19). ALJ said she met insured status requirements through December 31, 2018. [3] (Doc. 7, p. 19). However, after reviewing the evidence in its entirety, the ALJ determined that the Plaintiff's impairments did not meet or equal the level of severity of any listed impairments described in Appendix 1 of the Regulations (20 CFR, Subpart P, Appendix 1). (Doc. 7, pp. 19-20). The ALJ found Plaintiff retained the residual functional capacity (RFC) to perform a full range of sedentary work as defined in 20 CFR 404.1567(a). (Doc. 7, p. 20). Ultimately, the ALJ concluded that the Plaintiff had not been under a disability within the meaning of the Social Security Act from December 23, 2013, the alleged onset date, through July 1, 2015, the date of the ALJ's decision. (Doc. 7, p. 23).

Subsequently, on July 14, 2015, Plaintiff requested a review of the hearing decision by the Appeals Council. (Doc. 7, p. 11). The Appeals Council denied her request on June 15, 2016. (Doc. 7, pp. 6-8). Plaintiff filed a Petition for Judicial Review of the matter on June 21, 2016. (Doc. 1). Both parties have submitted briefs, and this case is before the undersigned for report and recommendation. (Docs. 10, 13).

The Court has reviewed the transcript in its entirety. The complete set of facts and arguments are presented in the parties' briefs and are repeated here only to the extent necessary.

---

[2] Syncope—Loss of consciousness and postural tone caused by diminished cerebral blood flow. *Stedman's Medical Dictionary* 1887 (28th ed. 2006).

[3] The ALJ opinion states Plaintiff's date last insured is December 31, 2018; however, the disability determination explanation (initial and reconsideration) lists her DLI as December 31, 2017. (Doc. 7, pp. 19, 76, 87).

## II.    Evidence Submitted:

At the hearing before the ALJ on May 29, 2015, Plaintiff testified that she was born in 1957.  (Doc. 7, p. 33).   Plaintiff testified that she completed high school and obtained a bachelor's degree in business.  (Doc. 7, p. 33). Plaintiff's past relevant work consisted of a production inventory control specialist, a buyer or purchasing agent, and a demand forecaster. (Doc. 7, p. 40).

Prior to the relevant time period, in August and September of 2012, Plaintiff was treated by Dr. Gary Templeton, a pulmonary medicine specialist at the Fayetteville Diagnostic Clinic, for upper respiratory infection, cough and asthma.  (Doc. 7, pp. 503-504).  Plaintiff underwent a stress test on October 9, 2012, after she saw Advanced Practice Nurse, Kristin Zaharopoulos, a week earlier with complaints of tightness in her chest.  (Doc. 7, pp. 506-507, 511). The stress test showed low probability of underlying significant coronary artery disease.  (Doc. 7, p. 511). A few days later, Plaintiff reported that her chest pain improved after her anxiety medication was adjusted. (Doc. 7, p. 512).  Plaintiff was treated for viral gastroenteritis on December 12, 2012, and she visited the Allergy Care Center on January 3, 2013, for treatment for her allergies (including allergy shots) and related conditions, including a persistent cough, shortness of breath, asthma, hay fever symptoms, and runny nose. (Doc. 7, pp. 345, 359).  Notes from Plaintiff's visit to Ozark Guidance Center, where she was counseled by Lisa Kessler, LCSW, revealed that Plaintiff was dealing with some relational issues and stress over her termination at work. (Doc. 7, p. 285).  She was diagnosed with anxiety disorder, for which she received outpatient services. (Doc. 7, p. 285).  Clinic notes reveal that she was not prescribed any medication and that her progress was "much improved."  (Doc. 7, pp. 285-286).

Plaintiff returned to the Allergy Care Clinic in January of 2013, and in March 2013, she visited Washington Regional Medical System for a rash on both of her arms, for which she was prescribed an eczema cream as treatment. (Doc. 7, pp. 357, 583-584). In April of 2013, Plaintiff had a comprehensive medical evaluation by family physician, Dr. Ben Hall, at West Washington County Clinic, where Plaintiff was assessed with sinusitis, laryngopharyngeal reflux, extrinsic asthma, vitamin D deficiency, osteopenia, and depression with anxiety. (Doc. 7, p. 389). Her blood tests were normal, and a chest x-ray showed "old calcified granulomatous DZ, unchanged since 9.17.12." (Doc. 7, p. 389). Dr. Hall assessed Plaintiff with methylenetetrahydrofolate reductase deficiency and dyslipidemia in May of 2013, and he saw her for complaints of coughing symptoms in June of 2013. (Doc. 7, pp. 378-381). In July of 2013, Dr. Hall treated Plaintiff for depression and plantar warts. (Doc. 7, p. 373). Also in July of 2013, clinic notes reveal that Dr. Templeton assessed Plaintiff with reflux, dyspnea, and a cough that was multifactorial with asthma, reflux disease, and allergic rhinitis. Also from that date, a Pulmonary Function Report showed "[e]ven though the pre-bronchodilator spirometry is normal, there is a significant improvement in her pulmonary function tests after administration of bronchodilator. This is consistent with reactive airway disease." (Doc. 7, pp. 287-292, 516-517). Plaintiff was seen at the Walker Heart Institute's Cardiovascular Clinic by Dr. Geetha Ramaswamy for complaints of chest pain, dyspnea, shortness of breath, dizziness, and syncope. (Doc. 7, pp. 323, 325). Dr. Ramaswamy assessed Plaintiff with chest discomfort and hypercholesterolemia. (Doc. 7, p. 325).

On October 14, 2013, Plaintiff presented at the Washington Regional Medical Center Emergency Room for an episode of syncope. (Doc. 7, p. 299). Emergency room records showed that she did not pass out or fall, but had an episode of low blood pressure, sweating,

feeling weak, and feeling faint. (Doc. 7, p. 299). She was discharged that day in stable condition with instructions to eat protein snacks between meals and increase her fluid intake. (Doc. 7, pp. 302-304). A chest x-ray from that emergency room visit showed no acute cardiopulmonary process. (Doc. 7, p. 310).

In November of 2013, Plaintiff was treated by the Allergy Care Clinic for complaints of congestion and other allergy symptoms. (Doc. 7, p. 356). Also in November of 2013, Plaintiff had a follow up appointment with Dr. Ramaswamy for her hypercholesterolemia. (Doc. 7, p. 330). Dr. Ramaswamy's notes reflect recent near syncopy episodes for which a tilt table test and echocardiogram were ordered. (Doc. 7, p. 332). Plaintiff's echocardiogram, performed on December 3, 2013, showed abnormal results, and Plaintiff's tilt table test was positive. (Doc. 7, pp. 295, 490).

During the relevant time period, Dr. Soliman Soliman, a cardiologist at the Walker Heart Institute of Northwest Arkansas, diagnosed Plaintiff with neurocardiogenic syncope, prescribed medication for her condition, and instructed her to avoid dehydration. (Doc. 7, p. 329). Plaintiff reported to Dr. Ramaswamy in January of 2014 that she had been diagnosed with neurocardiogenic syncope by Dr. Soliman and that he had prescribed Midodrine; however, Plaintiff also reported that she was unable to take the medication due to the side effects. (Doc. 7, p. 334). Also in January of 2014, Plaintiff underwent an employment occupational evaluation at the Arkansas Occupational Health Clinic by Dr. Gary Moffitt when she began her employment at American Air Filter International. (Doc. 7, pp. 311, 314). Plaintiff reported to Dr. Moffitt that her daily activities included working with the youth at her church, exercising, sewing, gardening, and caring for her mother. (Doc. 7, pp. 311, 314). In the report, Dr. Moffitt noted Plaintiff's neurogenic syncope, which he categorized as "not

stable," and he concluded that Plaintiff was "NOT qualified for the position." (Doc. 7, pp. 311, 314). Progress notes from a follow up visit on February 25, 2014, with Dr. Soliman for Plaintiff's neurocardiogenic syncope showed that Plaintiff stopped her medication due to symptoms of nausea, but that the condition was "stable with nonpharmalogical management." (Doc. 7, p. 341). In March of 2014, Plaintiff had a procedure to remove inflamed seborrheic keratosis on her right thigh. (Doc. 7, p. 369). Also, in March of 2014, Plaintiff returned to the Allergy Care Center with complaints of a runny nose, asthma, and mouth breathing. (Doc. 7, p. 343). Plaintiff was treated with an increase in her Advair dosage and instructed to continue her allergy injection antigen mixture. (Doc. 7, p. 355).

On March 27, 2014, Dr. Kevin Santulli, Ph.D. performed a Psychiatric Review Technique, finding that Plaintiff had only mild restrictions of activities of daily living, maintaining social functioning, and maintaining concentration, persistence or pace. He concluded that Plaintiff's mental impairment was not severe. (Doc. 7, p. 81). On March 31, 2014, Dr. Kristin Jarrard completed a physical RFC Assessment, where she determined that had environmental limitations and must avoid exposure to hazards (machinery, heights, etc.). (Doc. 7, pp. 82-83).

On April 15, 2014, Plaintiff underwent a CT scan of her chest, showing the following: Stable 6 MM non-calcified pulmonary nodule involving the right middle lobe; no speculated masses or thoracic adenopathy suspicious for neoplasia identified; probable, minimal atelectasis involving the right lower lobe; and stable cystic lesions involving both lobes of the liver, probably benign. (Doc. 7, p. 469). On that same day, Plaintiff also underwent a CT scan of her abdomen and pelvis showing stable, benign appearing cysts involving both lobes of the

liver measuring up to 3 cm in diameter and stable 6MM non-calcified pulmonary granuloma involving the right middle lobe. (Doc. 7, p. 471).

Also in April of 2014, Dr. Ben Hall ordered a MRI of Plaintiff's left knee after she presented with complaints of pain in her left knee and right arm. (Doc. 7, pp. 438-439). He prescribed a wrist splint and ibuprofen for her arm pain. (Doc. 7, p. 439). Plaintiff's MRI of her left knee revealed the following: blunting of the posterior horn of the lateral meniscus consistent with a short radial tear; intact left knee ligaments; thickened appearance of superolateral suprapatellar synovial plica; small joint effusion; and patellofemoral compartment chondrosis. (Doc. 7, p. 430).

On April 28, 2014, Plaintiff was assessed and treated with acute maxillary sinusitis. (Doc. 7, pp. 585-588). On May 1, 2014, Plaintiff saw Dr. Hall for complaints of asthma, depression, vitamin D deficiency, GERD, osteopenia, and dyslipidemia. (Doc. 7, p. 441). An x-ray of Plaintiff's chest revealed calcified granulomatous DZ, a calcified aortic knob, and no additional changes since April 24, 2013. (Doc. 7, p. 446). On May 20, 2104, Plaintiff returned to Dr. Templeton for worsening of her chronic cough, secondary to acute sinusitis causing an exacerbation of her asthma. Clinic notes reveal Plaintiff's symptoms were improving with antibiotics and Advair and that Plaintiff's gastroesophageal reflux disease was contributing to her cough. (Doc. 7, p. 478). Plaintiff was treated for tennis elbow by Dr. Johnny Adkins, family physician at Washington Regional Medical System, in June of 2014. (Doc. 7, p. 592). On August 7, 2014, Plaintiff was also treated by Dr. Adkins for urinary frequency, for which she was prescribed cephalexin. (Doc. 7, pp. 594-597).

On August 5, 2014, Dr. Jonathan Norcross completed a physical RFC assessment, finding that Plaintiff had environmental limitations and must avoid exposure to hazards (machinery, heights, etc.). (Doc. 7, pp. 95-96). On that same date, Dr. Christal Janssen, Ph.D. completed a Psychiatric Review Technique, finding that Plaintiff had only mild restrictions of activities of daily living, maintaining social functioning, and maintaining concentration, persistence or pace. She determined her mental impairment was not severe. (Doc. 7, p. 94).

On October 2, 2014, Plaintiff saw Dr. Adkins for fatigue, and he ordered lab work. (Doc. 7, pp. 599-602). On October 8, 2014, Plaintiff returned to Dr. Adkins for a follow up from her emergency room visit for chest pain and reflux symptoms, and Dr. Adkins proceeded by ordering a referral to a gastroenterologist. (Doc. 7, pp. 605-608). Also in October of 2014, Plaintiff had a follow up with Dr. Ramaswamy. (Doc. 7, pp. 493-495). Clinic notes revealed that Plaintiff's recent EKG, performed during a recent hospitalization, was unremarkable, but Dr. Ramaswamy proceeded with ordering a stress echocardiogram. (Doc. 7, pp. 493-495).

On October 24, 2014, Plaintiff saw Dr. Sidney Vinson at North Hills Gastroenterology Center for persistent reflux symptoms. (Doc. 7, p. 498). Pathology results showed duodenal mucosa with no histopathologic abnormality and no evidence of parasite or celiac disease. (Doc. 7, p. 501).

In November of 2014, Plaintiff saw Advanced Practice Registered Nurse Cheryl Walsh at the Fayetteville Diagnostic Center for a follow up of abdominal pain and diarrhea. She was assessed with acid reflux and alternating constipation and diarrhea. (Doc. 7, pp. 525-528). Also in November of 2014, Plaintiff saw Dr. Adkins for a sore throat and was assessed with acute maxillary sinusitis. (Doc. 7, p. 609). In December of 2014, Plaintiff returned to Nurse

Walsh for a follow up for abdominal pain and heartburn. (Doc. 7, p. 531). She returned to Nurse Walsh again in February of 2015 for another follow up, and clinic notes reveal that her symptoms had improved. (Doc. 7, p. 535).

On January 6, 2015, Dr. Adkins prescribed eye drops for Plaintiff's symptoms of eye discharge and pain that had lasted for two days. (Doc. 7, pp. 615-618).

On February 10, 2015, Plaintiff presented at WR Ozark Urology in Fayetteville for an initial evaluation for incontinence. (Doc. 7, pp. 540-547). Clinic notes reflect that Plaintiff reported that she had suffered from incontinence for a year, but it had worsened. (Doc. 7, p. 540). She was assessed with urge incontinence of urine and referred to physical therapy. (Doc. 7, p. 546).

Also in February of 2015, Plaintiff returned to Dr. Adkins with complaints of cold symptoms and was diagnosed with acute maxillary sinusitis and hypersomnia. (Doc. 7, pp. 621-625). Plaintiff attended physical therapy for her incontinence on February 26, 2015.

On March 3, 2015, Plaintiff saw Dr. Soliman for an annual examination. While she was assessed with neurocardiogenic syncope, Dr. Soliman made no changes in her treatment and instructed her to return in one year. (Doc. 7, pp. 632-635). On March 9, 2015, Plaintiff attended physical therapy for incontinence. (Doc. 7, p. 553).

On March 10, 2015, Dr. Soliman completed a Physical Residual Functional Capacity Questionnaire, where he opined that Plaintiff could sit approximately two hours and stand/walk less than two hours, while needing additional breaks during the day. (Doc. 7, p. 487). He noted her treatment of liberal fluid and salt intake and avoidance of standing for long periods. He

also noted her diagnosis of neurocardiogenic syncope and opined that her prognosis was "fair." (Doc. 7, p. 485).

On April 3, 2015, Plaintiff had an annual examination with Dr. Adkins. (Doc. 7, pp. 576-580). Clinic notes showed that Plaintiff was unable to be around fumes or smells due to asthma and a sore throat. (Doc. 7, p. 576). She was assessed with intrinsic asthma, acute maxillary sinusitis, and hypercholesterolemia. (Doc. 7, p. 580). Dr. Adkins noted that his plan was to make referrals for a pulmonary consultation and an infectious disease consultation. (Doc. 7, p. 580).

On April 9, 2015, Dr. Adkins completed a Physical Residual Functional Capacity Questionnaire, where he opined that Plaintiff could sit approximately four hours and stand/walk less than two hours, while needing additional breaks during the day. (Doc. 7, p. 629). He also noted anxiety as a psychological condition impacting Plaintiff's physical condition and her prognosis as "fair." (Doc. 7, pp. 627-628).

On May 7, 2015, Plaintiff underwent an evaluation for her asthma. (Doc. 7, pp. 650-651). Due to complaints of trouble falling asleep, trouble staying asleep, and feeling tired when she woke, Christie Hancock, APRN, recommended a sleep study. (Doc. 7, p. 650). Plaintiff was also counseled not to operate a motor vehicle or heavy machinery while experiencing symptoms of drowsiness. (Doc. 7, p. 651).

On May 18, 2015, Plaintiff presented at Northwest Arkansas EMG Clinic, for an electrodiagnostic consultation by Dr. Miles Johnson. (Doc. 7, p. 636). The study was consistent with a diagnosis of carpal tunnel syndrome; however, there was no evidence of radiculopathy, plexopathy, generalized peripheral neuropathy, or other peripheral nerve

entrapment syndromes or injuries. (Doc. 7, p. 637). Also in May of 2015, Dr. Michael Eckles at the Fayetteville Diagnostic Clinic diagnosed Plaintiff with severe obstructive sleep apnea. He recommended using a CPAP machine, increasing exercise, losing weight, avoiding driving or operating machinery if sleepy, and returning in four to six weeks. (Doc. 7, pp. 643-644).

On May 22, 2015, Plaintiff saw Dr. Stephen Hennigan, an Infectious Disease Specialist in Northwest Arkansas, for her chronic maxillary sinusitis. (Doc. 7, p. 653). Dr. Hennigan cultured Plaintiff's right nasal passage and ordered a CT scan of her sinuses. (Doc. 7, p. 655).

## III.    Applicable Law:

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. Ramirez v. Barnhart, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. Edwards v. Barnhart, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted

at least one year and that prevents her from engaging in any substantial gainful activity. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); see also 42 U.S.C. §§ 423(d)(1)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3). A Plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given her age, education, and experience. See 20 C.F.R. § 404.1520(a)(4). Only if the final stage is reached does the fact finder consider the Plaintiff's age, education, and work experience in light of her RFC. See McCoy v. Schweiker, 683 F.2d 1138, 1141-42 (8th Cir. 1982), abrogated on other grounds by Higgins v. Apfel, 222 F.3d 504, 505 (8th Cir. 2000); 20 C.F.R. § 404.1520(a)(4)(v).

**IV.    Discussion:**

Plaintiff makes the following arguments on appeal: 1) the ALJ erred in considering Plaintiff's impairments in combination; 2) the ALJ failed to properly evaluate the credibility of Plaintiff's subjective complaints of pain; 3) the ALJ erred in properly evaluating the

opinions of treating physicians, Dr. Johnny Adkins and Dr. Soliman Soliman; and 4) the ALJ failed to properly assess the RFC for sedentary work. [4]

**A. Insured Status and Relevant Time Period:**

In order to have insured status under the Act, an individual is required to have twenty quarters of coverage in each forty-quarter period ending with the first quarter of disability. 42 U.S.C. § 416(i)(3)(B). Plaintiff last met this requirement on December 31, 2017. Regarding Plaintiff's application for DIB, the overreaching issue in this case is the question of whether Plaintiff was disabled during the relevant time period of December 23, 2013, her alleged onset date of disability, through July 1, 2015, the date of the ALJ's opinion.

In order for Plaintiff to qualify for DIB she must prove that, on or before the expiration of her insured status she was unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which is expected to last for at least twelve months or result in death. Basinger v. Heckler, 725 F.2d 1166, 1168 (8th Cir. 1984). Records and medical opinions from outside the insured period can only be used in "helping to elucidate a medical condition during the time for which benefits might be rewarded." Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006) (holding that the parties must focus their attention on claimant's condition at the time he last met insured status requirements).

**B. Combination of Impairments:**

Plaintiff argues that the ALJ erred in failing to consider all of her impairments in combination. The ALJ stated that in determining Plaintiff's RFC prior to the expiration of her insured status, he considered "all of the claimant's impairments, including impairments that are not severe." (Doc. 7, p. 18). The ALJ further found that Plaintiff did not have an

---

[4] The Court has reordered Plaintiff's arguments to correspond with the five-step analysis utilized by the Commissioner.

impairment or combination of impairments that met or medically equaled one of the listed impairments found in Appendix I, Subpart P, Regulation No. 4. (Doc. 7, p. 19-20). Such language demonstrates the ALJ considered the combined effect of Plaintiff's impairments. Hajek v. Shalala, 30 F.3d 89, 92 (8th Cir. 1994).

### C. Subjective Complaints and Symptom Analysis:

The ALJ was required to consider all the evidence relating to Plaintiff's subjective complaints including evidence presented by third parties that relates to: (1) Plaintiff's daily activities; (2) the duration, frequency, and intensity of her pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of her medication; and (5) functional restrictions. See Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). While an ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole. Id. As the Eighth Circuit has observed, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide." Edwards v. Barnhart, 314 F.3d 964, 966 (8th Cir. 2003).

After reviewing the administrative record, it is clear that the ALJ properly considered and evaluated Plaintiff's subjective complaints, including the Polaski factors. The record reflects that Plaintiff completed a Function Report wherein she reported that she could manage her personal care, prepare meals, clean house, iron clothes, complete light household repairs, do light yard work, volunteer for her church, and care for her pet. (Doc. 7, p. 230). She also reported that she could care for her mother by bathing her, taking her to doctor appointments, doing her laundry, cooking for her, and keeping her on her medication. (Doc. 7, p. 230). Plaintiff stated that she could drive a car, go out alone, and shop in stores for food, clothing

and household needs. (Doc. 7, p. 233). She also reported that she enjoyed sewing, watching television, tending to her flower beds, and attending church activities, which she attended four days a week during the school year. (Doc. 7, p. 234).

This level of activity belies Plaintiff's complaints of pain and limitation, and the Eighth Circuit has consistently held that the ability to perform such activities contradicts a Plaintiff's subjective allegations of disabling pain. See Hutton v. Apfel, 175 F.3d 651, 654-655 (8th Cir. 1999) (holding ALJ's rejection of claimant's application supported by substantial evidence where daily activities—making breakfast, washing dishes and clothes, visiting friends, watching television and driving—were inconsistent with claim of total disability).

With regard to Plaintiff's physical impairments, the record revealed that she was treated conservatively for her syncope, reflux, urinary incontinence, a period of abdominal pain and diarrhea, sleep apnea, asthma and allergies, and carpal tunnel syndrome, and appeared to experience some relief with the use of medication for carpal tunnel syndrome, reflux, cough, and asthma and allergies. See Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998); see Robinson v. Sullivan, 956 F.2d 836, 840 (8th Cir. 1992) (course of conservative treatment contradicted claims of disabling pain). While Plaintiff returned to Dr. Soliman for follow-up visits for her syncope, the record showed Plaintiff had not actually lost consciousness from the syncope episode in October of 2013, and she had not reported any further episodes of near syncope or fainting after January of 2014. Plaintiff did not tolerate medication for syncope well; however, based on Dr. Soliman's clinic notes, Plaintiff's syncope was "stable with non-pharmacologic management." (Doc. 7, pp. 334-336, 341).

With respect to Plaintiff's alleged mental impairments, the record fails to establish that Plaintiff sought on-going and consistent treatment from a mental health provider. See Gowell

v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001) (holding that lack of evidence of ongoing counseling or psychiatric treatment for depression weighs against Plaintiff's claim of disability). Prior to the relevant time period, there were two incidences where the record showed that Plaintiff complained of depression. First, on April 24, 2013, Dr. Hall diagnosed Plaintiff with depression and anxiety and prescribed medication for her depression. (Doc. 7, pp. 384-389). Second, and also prior to the relevant time period, Plaintiff received outpatient services from Ozark Guidance Center, for an anxiety disorder secondary to relational problems, noting occupational problems as well, but no medication was prescribed. (Doc. 7, p. 286). Upon discharge, it was noted that Plaintiff had worked through her relational issues and her termination at work, leaving her situation much improved. (Doc. 7, p. 286). Thus, the medical records showed that Plaintiff was not consistently prescribed medication or treated for depression or anxiety during the relevant time period. The Court finds substantial evidence supports the ALJ's determination that Plaintiff did not have a disabling mental impairment.

While it is clear that Plaintiff suffers with some degree of limitation, she has not established that she was unable to engage in any gainful activity during the relevant time period. Accordingly, the Court concludes that substantial evidence supports the ALJ's conclusion that Plaintiff's subjective complaints were not totally credible.

D. **The ALJ's RFC Determination and Medical Opinions:**

Plaintiff alleges that the ALJ erred in properly evaluating the opinions of treating physicians, Dr. Johnny Adkins and Dr. Soliman Soliman, and that the ALJ failed to properly assess the RFC for sedentary work.

RFC is the most a person can do despite that person's limitations. See 20 C.F.R. § 404.1545(a)(1). It is assessed using all relevant evidence in the record. Id. This includes medical records, observations of treating physicians and others, and the claimant's own descriptions of her limitations. See Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004). Limitations resulting from symptoms such as pain are also factored into the assessment. See 20 C.F.R. § 404.1545(a)(3). The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace. See Lewis v. Barnhart, 353 F.3d 642, 646 (8th Cir. 2003). "[T]he ALJ is [also] required to set forth specifically a claimant's limitations and to determine how those limitations affect his RFC." Id.

In deciding whether a claimant is disabled, the ALJ considers medical opinions along with "the rest of the relevant evidence" in the record. 20 C.F.R. § 404.1527(b). "It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians. The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole." Wagner v. Astrue, 499 F.3d 842, 848 (8th Cir. 2007), citing Pearsall v. Massanari, 274 F.3d 1211, 1219 (8th Cir. 2001) (internal citations omitted).

The SSA regulations set forth how the ALJ weighs medical opinions. The regulations provide that "unless [the ALJ] give[s] a treating source's opinion controlling weight ... [the ALJ] consider[s] all of the following factors in deciding the weight [to] give to any medical

opinion": (1) examining relationship; (2) treating relationship; (3) supportability of the opinion; (4) consistency; (5) specialization; and, (6) "any factors [the applicant] or others bring[s] to [the ALJ's] attention." 20 C.F.R. § 404.1527(c). The regulations provide that if the ALJ finds "that a treating source's opinion on the issue(s) of the nature and severity of [the applicant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and *is not inconsistent with the other substantial evidence in [the applicant's] record,* [the ALJ] will give it controlling weight." Id. at § 404.1527(c)(2) (emphasis added).

In finding Plaintiff able to perform sedentary work, the ALJ considered Plaintiff's subjective complaints and the medical records of her treating, examining and non-examining physicians. Specifically, the ALJ addressed the relevant medical records, and the medical opinions of treating, examining and non-examining medical professionals, and set forth the reasons for the weight given to the opinions. Renstrom v. Astrue, 680 F.3d 1057, 1065 (8th Cir. 2012) ("It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians") (citations omitted); Prosch v. Apfel, 201 F.3d 1010, 1012 (the ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole).

With regard to the opinions of treating physicians, Dr. Johnny Adkins and Dr. Soliman Soliman, Plaintiff argues that the ALJ erred in failing to properly assess their opinions provided in the Physical Residual Functional Capacity Questionnaires. In Dr. Soliman's Physical Residual Functional Capacity Questionnaire, he opined that Plaintiff could sit approximately two hours, that she could stand or walk less than two hours, and that she may need additional breaks. (Doc. 7, p. 487). The ALJ noted that Dr. Soliman did not describe any particular

reasons for the limitations he imposed and that the opinion was not consistent with his own examinations or the rest of the medical record. (Doc. 7, p. 22). Therefore, the ALJ gave it little weight. (Doc. 7, p. 22).

Medical records showed that Plaintiff first saw Dr. Soliman in December of 2013 after her near episode of syncope. At that visit, Dr. Soliman examined Plaintiff, diagnosed her with neurocardiogenic syncope, instructed her to avoid dehydration and to drink plenty of fluids, instructed her to monitor her salt intake, and gave her a prescription for Midodrine. (Doc. 7, pp. 326-329). She was also instructed not to take the medication if she did not tolerate it well, to avoid any work situation that could be dangerous if she passed out, and to return in three months for a follow up. (Doc. 7, p. 329). At her second visit to Dr. Soliman's office, Plaintiff had a normal physical examination, and it was noted that she could not tolerate the medication for syncope. (Doc. 7, pp. 338-341). Dr. Soliman opined that Plaintiff's syncope was "stable now and nonpharmacological management," and that she should return in one year for follow up. (Doc. 7, p. 341). Plaintiff last saw Dr. Soliman on March 3, 2015. (Doc. 7, pp. 632-635). At that visit Plaintiff admitted symptoms of fatigue, shortness of breath, dizziness and lightheadedness; however, Dr. Soliman opined that her neurocardiogenic syncope was stable, recommended that Plaintiff continue the same management, and that she return in one year. (Doc. 7, p. 635).

In Dr. Adkins' Physical Residual Functional Capacity Questionnaire, he opined that Plaintiff could stand or walk less than two hours, that she could sit approximately four hours, that she may need additional breaks, and that she could rarely lift less than ten pounds, and that she was capable of a low stress job. (Doc. 7, pp. 628-630). The ALJ noted that this assessment was similar to Dr. Soliman's opinion, that it had been considered, and that it was accorded

"some weight." (Doc. 7, p. 22). The medical records showed that during the relevant time period, Dr. Adkins treated Plaintiff for various minor conditions, such as tennis elbow, urinary infrequency, fatigue, reflux, chest pain, rhinitis, eye discharge, cold symptoms, and seasonal allergies/asthma. (Doc. 7, pp. 580, 592, 597, 602, 608, 612, 615, 625).

In assessing these medical opinions, the ALJ gave them some weight, noting that Plaintiff had not reported to any of her doctors that she had had any further episodes of fainting, nor had Plaintiff actually experienced any additional episodes of syncope during the relevant time period. Thus, the ALJ determined that Plaintiff could perform a full range of sedentary work. (Doc. 7, p. 22). It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians. Renstrom v. Astrue, 680 F.3d 1057, 1065 (8th Cir. 2012) (citations omitted).

The ALJ further considered the opinions of the non-examining medical consultants, Drs. Kristin Jarrad and Jonathan Norcross, who reviewed the medical record and found that Plaintiff had environmental limitations and must avoid exposure to hazards. (Doc. 7, pp. 82-83, 95-96). Moreover, non-examining medical consultants, Drs. Kevin Santulli and Christal Jansen, also found that Plaintiff did not have a severe mental impairment. (Doc. 7, pp. 81-94). The ALJ gave these opinions little weight, as additional evidence was submitted that was not available to them at the time of their review. (Doc. 7, p. 23).

As previously noted, Plaintiff has never undergone anything but a conservative course of treatment for her conditions, including but not limited to, medication, braces or splints, and lifestyle changes. See Black v. Apfel, 143 F.3d 383 at 386. Plaintiff's reported activities of daily living also support the ALJ's determination that she could perform sedentary work.

Specifically, Plaintiff reported that she could manage her personal care; prepare meals; clean house; iron clothes; complete light household repairs; do light yard work; volunteer for her church; care for her pet; drive a car; go out alone; and shop in stores for food, clothing and household items. Further, Plaintiff reported that she could also care for her mother by bathing her, taking her to doctor appointments, doing her laundry, cooking for her, and keeping her on her medication. (Doc. 7, pp. 230, 233). Additionally, she also reported that she enjoyed sewing, watching television, tending to her flower beds, and attending church activities numerous times per week during the school year. (Doc. 7, p. 234).

Based on the record as a whole, the Court finds substantial evidence to support the ALJ's RFC determination.

### E. Past Relevant Work

Plaintiff has the initial burden of proving that she suffers from a medically determinable impairment which precludes the performance of past work. Kirby v. Sullivan, 923 F.2d 1323, 1326 (8th Cir. 1991). Only after the claimant establishes that a disability precludes performance of past relevant work will the burden shift to the Commissioner to prove that the claimant can perform other work. Pickner v. Sullivan, 985 F.2d 401, 403 (8th Cir. 1993).

According to the Commissioner's interpretation of past relevant work, a claimant will not be found to be disabled if she retains the RFC to perform:

> 1. The actual functional demands and job duties of a particular past relevant job; *or*

> 2. The functional demands and job duties of the occupation as generally required by employers throughout the national economy.

20 C.F.R. § 404.1520(e); S.S.R. 82-61 (1982); <u>Martin v. Sullivan</u>, 901 F.2d 650, 653 (8th Cir. 1990) (expressly approving the two part test from S.S.R. 82-61).

Here, the ALJ specifically found that Plaintiff could return to her past relevant work as a production scheduler. In doing so, the ALJ relied upon the opinion of a vocational expert, who opined that Plaintiff's past relevant work as a production scheduler was considered sedentary work in the Dictionary of Occupational Titles. <u>See</u> <u>Gilbert v. Apfel</u>, 175 F.3d 602, 604 (8th Cir. 1999) ("The testimony of a vocational expert is relevant at steps four and five of the Commissioner's sequential analysis, when the question becomes whether a claimant with a severe impairment has the residual functional capacity to do past relevant work or other work") (citations omitted). Accordingly, the Court finds substantial evidence to support the ALJ's finding that Plaintiff could perform her past relevant work as a production scheduler, as that job is generally performed.

## V.    Conclusion:

Based on the foregoing, the Court recommends affirming the ALJ's decision, and dismissing Plaintiff's case with prejudice. **The parties have fourteen days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 3rd day of May, 2017.


/s/ *Erin L. Wiedemann*
HON. ERIN L. WIEDEMANN
UNITED STATES MAGISTRATE JUDGE